IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KELLY PROBST, <br> individually and as Administratix of <br> the Estate of Christopher Probst, <br><br> Plaintiff, <br><br> v. <br><br> CONSOLIDATED CARE, INC., et al., <br><br> Defendants. | Case No. 06-594 <br> JUDGE ALGENON L. MARBLEY <br> Magistrate Judge Norah McCann King |

## OPINION AND ORDER

### I.  INTRODUCTION

This matter comes before the Court on Defendants' Motion for Summary Judgment. Kelly Probst ("Probst"), on behalf of the estate of her son, Christopher Probst ("Christopher") filed this civil-rights and wrongful-death action after her son committed suicide while he was living at a juvenile detention facility.  Defendants in this case include: (1) the mental health service-provider, Consolidated Care, Inc. ("CCI"); and (2) CCI's independently licensed social worker who assessed Christopher, Jennifer Plumley ("Plumley") (collectively, "Defendants").[1] Probst alleges that Defendants employed unconstitutional policies that constituted deliberate indifference to Christopher's medical needs under the Eighth Amendment.  Because of Defendants' reckless adherence to these unconstitutional policies and failure to assess Probst's mental state adequately, Christopher committed suicide.

---

[1] Defendants Central Ohio Youth Center, Victoria Jordan, and Emily Giametta also filed Motions for Summary Judgment, but subsequently reached a settlement agreement with Plaintiff.

Defendants urge this Court to find, as a matter of law, that their policies or behavior did not amount to "deliberate indifference" to Probst's medical needs.  For the reasons stated below, the Court **GRANTS** Defendants' motion with respect to wrongful-death under §1983**,** and **DENIES** Defendants' motion on all other claims.

## II.  FACTS AND PROCEDURAL HISTORY

### A.  Background to Christopher's Suicide

In early 2004, seventeen-year-old Christopher Probst lived with his mother and three-month old daughter while attending high school in Ohio.  Christopher was the victim of sexual abuse as a child and subsequently developed a drug addiction.  He suffered mental-health problems and, in his teenage years, committed several crimes.

In June of 2004, Christopher violated the conditions of his house arrest and, as a result, the Knox County Juvenile Court ordered that he spend ninety-days at Central Ohio Youth Center ("COYC"), a juvenile detention facility, in Marysville, Ohio.  On June 25, 2004, Christopher began COYC's ninety-day Extended Detention Unit Program ("EDU"), where he was treated by Emily Giametta ("Giametta"), a COYC social worker.  Giametta met with Christopher for individual sessions, where she gathered considerable history about his background and personality, including details about the sexual abuse he suffered, suicidal thoughts, drug abuse, family conflict, and criminal behavior.

While at COYC, Christopher was charged with plotting an escape attempt from the facility.  Consequently, COYC put Probst on room confinement, starting July 11, 2004, where he was only allowed out of his room for school and cleaning and was denied access to books, TV, music, the telephone, movies, and other privileges.

### B.  The Day of Christopher's Suicide

Though COYC Superintendent, Victoria Jordan ("Jordan"), does not remember, Probst alleges that on July 16, 2004, Jordan came into Christopher's room to talk with him.  Jordan told Christopher that they would likely transfer him to the Ohio Department of Youth Services ("DYS") until he was twenty-one because he was not behaving himself and refused to follow the rules.

At approximately 4:40 p.m., Christopher was found in his cell crying and upset.  Christopher told the detention officers that he wanted to kill himself.  Giametta subsequently met with Christopher, where she confirmed that he was suicidal.  Earlier that day he had tied a sheet around his neck in an attempt to hang himself from a light fixture, but he could not get the sheet to stay on the light fixture.  In talking with Christopher, Giametta noted that he felt hopeless about his future, was feeling as if he wanted to explode, and was upset after learning that his mother might return to prison and that he might be transferred to DYS.  He was crying hysterically, and told Giametta that he wanted to die, that he had nothing to live for, and that she would not see him again.  He refused to sign a contract for safety, which is essentially a promise not to commit any acts of self-harm.  At 5:30 p.m., after talking with Christopher, Giametta placed him on suicide "precautions," meaning that he was moved to the dining room where he could be under constant supervision, and forced him to change into a paper gown.

Before leaving for the day, Giametta contacted CCI and asked it to send a social worker to assess Christopher's mental condition.  Pursuant to the terms of a Memorandum of Understanding (the "MOU") between COYC and CCI dated October 19, 2003, CCI provided independent suicide evaluations on an as-needed basis to COYC.  When a social worker at

COYC felt that an inmate posed a risk of hurting himself, the social worker would contact CCI, which would dispatch one of its employees to make an independent evaluation of the inmate. CCI charged $150 per hour for this service.  COYC was under no obligation to follow CCI's recommendations, but, in practice, Jordan testified that the recommendations of CCI's health professionals were always followed.  Even if guards or other COYC personnel disagreed with CCI's recommendation, they were to follow the recommendations strictly.

At approximately 7:00 p.m. on July 16, 2004, CCI's independently licensed social worker, Plumley, arrived at COYC and evaluated Christopher.  When she arrived, she was provided with Christopher's intake sheet and nothing else.  Giametta had failed to write up an incident report before she left work, and Giametta did not leave for Plumley either Christopher's medical file or her earlier assessment of his suicide attempts. COYC's confidentiality policy precluded her from giving such information to Plumley.  It is undisputed that Plumley did not attempt to contact Giametta, and that Giametta did not attempt to contact Plumley.  Without seeking more information on Christopher's medical history, Plumley interviewed Christopher and determined that he was not suicidal.  In the interview, Plumley learned about the suicide attempt earlier in the day, but Christopher told her that he never had any prior plan or intent to commit suicide, and then signed a contract for safety.  Plumley observed that Christopher was interactive, calm, cooperative, and self-assured.  Pursuant to Plumley's recommendation, COYC Supervisor Isaacs ("Isaacs") took Christopher off "precautions."  Isaacs testified that because Christopher appeared depressed and still had tears in his eyes, he was concerned about bringing him back to his cell where only hours before he had attempted suicide.  Nonetheless, he followed COYC policy, which mandated that he abide by Plumley's recommendation. Later that night,

Christopher hung himself with a bed sheet.

### C.  The Aftermath of Christopher's Suicide

After Christopher's suicide, both CCI and COYC investigated the incident.  Jordan's COYC investigation concluded that there were no COYC policy violations.  Similarly, CCI conducted an internal investigation to see what types of changes they could make to ensure that future suicides like Christopher's do not occur.  In 2000, CCI staff had been concerned about the lack of information provided to them by COYC before assessments, and CCI President Randall Reminder ("Reminder") met with COYC about the issue, but no changes were made.  After the suicide, Reminder again expressed his concern to Jordan in a letter stating that their current contract "does not address the primary concern that CCI staff share -- that of access to the records (as it pertains to their mental-health) of person(s) referred to us.  We believe that access to that portion of their file will allow for a more complete review on the part of the clinician at the time of an assessment of personal harm."

Indeed, had Plumley had access to Christopher's file when she made her determination to take him off precautions, she may have made a different decision.  Once Plumley learned from CCI social worker Mindy Koenig ("Koenig") what was in Giametta's notes, Plumley cried.  She told Koenig that if she had known that Christopher had refused to contract for safety with Giametta and that Giametta thought he was suicidal, she would have kept him on precautions and would not have sent him back to his room.

### D.  Procedural History

On July 14, 2006, Probst filed her complaint against Defendants.  In Count I, Probst claims that Defendants violated 42 U.S.C. § 1983 by depriving Christopher of his Eighth and

Fourteenth Amendment rights. In Counts II and III, Probst asserts state-law tort claims for negligence and wrongful-death.

On November 22, 2006, CCI and Plumley moved for summary judgment on Probst's §1983 claim and to dismiss Probst's state-law claims for lack of jurisdiction. This Court denied Defendants' motion, concluding that CCI and Plumley were state actors and therefore jurisdiction in this Court is proper.

Now each Defendant brings a Motion for Summary Judgment on Probst's substantive legal claims. All responsive pleadings have been filed and these motions are ripe for resolution.

### III. STANDARD of REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Vatrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). In response, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. In responding to a Motion for Summary Judgment, however, the nonmoving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex,* 477 U.S. at 324*; Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1995).

## IV.  ANALYSIS

### A. §1983 CLAIMS

Section 1983 is not a source of substantive law, rather it is a vehicle through which constitutional rights may be enforced. A plaintiff can establish liability under 42 U.S.C. § 1983 by demonstrating that he was: (1) deprived of a right secured by the Constitution or laws of the United States; and (2) subjected or caused to be subjected to this deprivation by a person acting under color of state-law. *Flagg Bros. v. Brooks*, 436 U.S. 149, 155 (1978). This Court has already ruled that CCI and Plumley were acting under color of state-law; thus, at issue now is Probst's allegation that Defendants denied adequate medical treatment, as required by the Eighth Amendment, to Christopher Probst.

In order to establish this constitutional claim of inadequate medical-care, Probst must prove that there was "deliberate indifference to [Christopher's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). The standard of deliberate indifference includes both objective and subjective components. *Id.* In *Farmer v. Brennan*, 511 U.S. 825, 837 (1994), the Supreme Court explained that deliberate indifference occurs in a prison context when officials

"know of and disregard an excessive risk to inmate health or safety: the officials must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and they must also draw the inference."  Moreover, courts have held that inadequate medical-care claims must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness . . . nevertheless, mere negligence or malpractice does not violate" the tenets of the Constitution.  *Estelle*, 429 U.S. at 107.

All parties agree that the objective component of the deliberate indifference standard is met because Christopher was at risk of serious harm given his suicidal tendencies.  The following analysis, therefore, focuses on the subjective component: whether Defendants' actually inferred that risk, but disregarded it.

### 1.  Plumley

Plumley contends that she never drew an inference that Christopher was at risk of serious harm and therefore she did not disregard any such risk.  Plumley attempts to establish that she conducted a thorough evaluation of Christopher and reached the conclusion that he was not suicidal.  Although this conclusion proved to be tragically incorrect, she essentially argues that the conclusion she drew is evidence that she did not reach an inference that Christopher presented a serious risk of suicide.  Plumley then deduces that if she never drew the inference, she could not have been deliberately indifferent to Christopher's serious psychological needs.

Probst, on the other hand, argues that there is enough evidence from which a jury could find that Plumley was aware that Christopher was at substantial risk of suicide, and that she disregarded that risk by removing him from precautions.  Probst asserts that the suicide risk factors present when Plumley assessed Christopher were so obvious that she must have been

aware of the substantial risk of harm, and thus she must have chosen to ignore that risk. But, by arguing that Plumley mis-diagnosed Christopher to the point of being deliberately indifferent, Probst misses the pivotal issue this Court must consider: whether Plumley was deliberately indifferent when she made a final suicide assessment knowing that, due to COYC's privacy policy, relevant information about Christopher was withheld from her.  In other words, did Plumley infer that a serious risk of harm could befall Christopher if she made a suicide assessment based on incomplete information?

Probst has adduced sufficient facts from which a jury could find that Plumley made such an inference, but disregarded it. Specifically, Probst points to the deposition testimony of CCI social worker, Mindy Koenig, who testified to the frequent concerns raised by CCI workers at staff meetings regarding the lack of communication between COYC and CCI:

> Q: And in those conversations, did it come up that there was maybe medical or mental-health information at COYC that the CCI assessor would want to know?
> A:  I remember talking about that a little, and the only records that we had access to were up front, they were basically demographic information and our assessments of patients...
> . . .
> Q: And did this come up at the, this communication issue between the two agencies, did that come up at CRT meetings prior to Chris's death?
> A:  I remember talking about it in the CRT myself, and I also remember just talking with my coworkers in general outside of the meeting...

Furthermore, the record documents that CCI staff had expressed concerns to COYC about the lack of information provided before assessments since 2000.

Plumley does not dispute, and the record establishes, that CCI social workers like herself knew that COYC was withholding pertinent files from them at the same time that COYC was asking them to make <u>final</u> suicide assessments.  Plumley also does not dispute that she did not

ask COYC for relevant background information about what prompted COYC to put Christopher on precautions. Given Plumley's training, and given her awareness of COYC's privacy policy and her decision to perform Christopher's suicide assessment anyway, a reasonable jury could find that Plumley actually inferred that Christopher was at risk of serious harm if assessed upon an incomplete picture of his mental state. Plumley's Motion for Summary Judgment is therefore **DENIED.**

### 2. CCI

Probst alleges that CCI is liable for unconstitutional policies, failure to supervise Giametta, and failure to train Plumley adequately. The policy argument rests on the idea that CCI agreed to provide final suicide assessments knowing that they would receive less medical information about patients than was potentially necessary to make adequate assessments. Probst's failure to supervise allegation stems from the fact that CCI was contracted to supervise Giametta on a weekly basis because she was unlicensed, and during the three-week period leading up to Christopher's suicide Giametta was practicing with no supervision from CCI. Probst's final claim is that CCI's failure to train Plumley on assessing incarcerated juveniles, as opposed to non-incarcerated juveniles, constituted deliberate indifference to inmates' serious medical needs.

In response to the allegation that CCI's policies violated Christopher's rights, CCI argues that Plaintiff fails to cite to any specific policy in particular, and that contracting to make assessments with knowledge that a patient's entire medical record will not be provided is not against the law. CCI's argument misses the mark. Agreeing to make suicide assessments in the absence of critical information may not be per se illegal, but it may nevertheless rise to the level

of §1983's deliberate indifference standard. Indeed, in the context of prison inmates, the question is whether the official knew of and disregarded an excessive risk to inmate security. *Brennan*, 511 U.S. at 837. At the very least, there is a genuine dispute regarding Defendants' inference of the risks inherent in making final assessments based upon incomplete medical information. Moreover, CCI's assertion fails to consider the critical element that it was not just agreeing to make uninformed assessments, but it was also tacitly agreeing to be the final decision-maker over patients' mental-health needs.

Accordingly, the Court finds that Probst has established a genuine issue of material fact as to CCI's indifference to Christopher's health needs. CCI's Motion for Summary Judgment is **DENIED.**

### B. NEGLIGENCE

Under Ohio law, to succeed on a negligence cause of action a plaintiff must demonstrate (1) a duty on the part of the defendant to protect the plaintiff from injury, (2) a breach of that duty, and (3) an injury proximately resulting from the breach. *Thomas v. Parma*, 624 N.E.2d 337, 339 (Ohio App. 8 Dist. 1993). An injury is foreseeable when a reasonably prudent person would have anticipated that the injury was likely to result from the performance or nonperformance of an act. *Id.*; *Freeman v. United States*, 509 F.2d 626 (6th Cir. 1975).

Probst argues that the issue here is whether the harm to Christopher was foreseeable, and that the facts necessary to determine foreseeability are in genuine dispute. Defendants counter with the untenable argument that suicide is an unpredictable intervening force which thereby prevents any of their actions from being the proximate cause of Christopher's suicide. This argument is questionable on its face because it necessarily assumes that medical examiners could

never be negligent in assessing the risk of suicide. It also ignores firmly established Ohio law, which does not hold suicide to be an intervening force that breaks the causal connection if the suicide was easily foreseeable by the Defendant. *Fisher v. Morales*, 526 N.E.2d 1098, 1100 (1987).

Therefore, the question before this Court is whether a reasonable jury could find that Christopher's suicide was foreseeable by the Defendants. The Court has already established that Probst has put forth sufficient evidence to overcome the deliberate indifference standard of §1983 with regards to each Defendant. The same facts in genuine dispute under the deliberate indifference standard, namely Defendants' knowledge of the risk of serious harm and failure to take reasonable steps to prevent the harm, will be relied upon by a jury to determine whether Christopher's suicide was foreseeable. Additionally, as was the case with their §1983 arguments, Defendants fail to account for the possibility that the very act of agreeing to make final suicide assessments while knowingly being provided with inadequate medical history is negligent and deliberately indifferent behavior.

Negligence presents a much lower threshold for Probst to meet than does deliberate indifference. Denying Defendants' Motions for Summary Judgment on the §1983 claim in this case warrants denying their Motion for Summary Judgment on the negligence claim as well. Motion for Summary Judgment **DENIED**.

### F. Wrongful-Death Under §1983

Probst voluntarily withdraws her wrongful death claim under §1983 because it is barred as a matter of law. "A wrongful-death action is a cause of action that inures to the benefit of a decedent's estate, as a result of, not the personal injury suffered by the decedent, but rather,

injuries to his estate caused by his wrongful-death." *Jaco v. Bloechle*, 739 F.2d 239, 242 (6th Cir. 1984). Probst puts forth no such claim of injury. Motion for Summary Judgment **GRANTED**.

### G. Wrongful-Death Under Ohio Law

In her complaint, Probst asserts that Defendants' actions caused Christopher's death. However, Probst's briefing presents absolutely no legal theory explaining how or why she believes defendants are liable for wrongful-death under Ohio law. Defendants respond with the same argument they asserted regarding the negligence claim: that CCI and Plumley were not the proximate cause of Christopher's suicide.

The only conclusion the Court can draw is that Probst brings forth the wrongful death claim based on a theory grounded in negligence. For the reasons stated in section (E), the Court **DENIES** CCI and Plumley's Motions for Summary Judgment.

### H. Punitive Damages

Punitive damages may be awarded in a §1983 action when a defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 56 (1983). Punitive damages based on Ohio law require proof of malice. O.R.C. §2315.21. "Malice" is defined as (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. *Preston v. Mutry*, 32 Ohio St.3d 334 (1987).

Defendants maintain that Plumley simply made a clinical judgment that proved incorrect,

but that it did not constitute malicious conduct.  Probst responds that this issue is uniquely factual and since the relevant facts are in dispute, summary judgment is improper.

The Court agrees with Probst.  The same factual issues in dispute under the §1983 deliberate indifference analysis are in dispute here.  There is a genuine dispute as to whether the Defendants' decision to knowingly perform final suicide assessments with incomplete information constituted a conscious disregard of Christopher's right to adequate medical treatment and created a substantial risk of harm to him.  Thus, the Court **DENIES** Defendants' motion with respect to the punitive damages claim.

### I.  All Other Claims

Probst voluntarily dismisses her Fourteenth Amendment, Due Process, and Equal Protection claims.

### V.  CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' motion with respect to the negligence claim, the claim of wrongful death under state law, the §1983 deprivation of rights claim, and the punitive damages claim.  The Court **GRANTS** Defendants' motion with respect to the claim of wrongful-death under §1983**,** and on all claims voluntarily withdrawn by Plaintiff.

**IT IS SO ORDERED.**

    s/Algenon L. Marbley
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT COURT**

**Dated: February 4, 2008**